## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE BUCCERI, JANET CHARAK, and LISA SANDERS, on behalf of themselves and all other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CUMBERLAND FARMS, INC. <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     CIVIL ACTION NO. 1:15-CV-13955 |

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT[1]
*(LEAVE TO FILE EXCESS PAGES GRANTED ON NOV. 14, 2017 (DKT. 200))*

## I.     INTRODUCTION

Defendant Cumberland Farms, Inc. ("Cumberland") moves for summary judgment as to all 102 Plaintiffs on the first and third prongs of the Fair Labor Standards Act's ("FLSA") executive exemption (*see* 29 C.F.R. ¶ 541.100(a)(1) & (a)(3)).  Cumberland also moves for summary judgment on the remaining prongs of the executive exemption against six Phase I Plaintiffs (Stephanie Burdick, Chad LaCasse, Gregory Mitchell, Janet Charak, Michael Jalbert and Anthony Marquette) who worked as Legacy Store Managers ("LSMs").  Cumberland argues that the FLSA's executive exemption bars Plaintiffs' overtime claims and that Plaintiffs are correctly classified as exempt from the FLSA's overtime requirements.

Cumberland bears a heavy burden to obtain summary judgment.  Not only must Cumberland show that there are no genuine material facts in dispute and that the undisputed material facts support summary judgment in its favor, Cumberland also must meet a very high

---

[1] For purposes of clarity, Plaintiffs have divided this brief into two sections.  The first section addresses Plaintiffs' opposition to Defendant's Motion for Summary Judgment.  The second section addresses Plaintiffs' Motion for Partial Summary Judgment and begins on page 35.

standard to show that Plaintiffs are exempt employees.  As the Supreme Court has made clear, "exemptions are to be narrowly construed against the employer seeking to assert them" and the employer bears the burden of "plainly and unmistakably" proving that the exemption applies. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  Cumberland ignores these high standards in its Motion.  Cumberland cannot prove that the executive exemption bars Plaintiffs' claims and its Motion must be denied.

Cumberland has failed to show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *MacGilvray v. City of Medford*, 585 F. Supp. 2d 175, 177 (D. Mass. 2008).  Cumberland's 305 statements of "fact," meandering across 82 pages, only serve to highlight how many material factual disputes exist. Moreover, Cumberland has failed to provide the Court with numerous material facts that undermine its Motion and instead has misrepresented Plaintiffs' complete testimony, relying on snippets of testimony that are taken out of context or just plain wrong.

For example, Cumberland states that Plaintiff LaCasse admitted that he "was also responsible for implementing sales plans."  Cumberland Statement of Facts ("Def. SOF") ¶ 98. Plaintiff LaCasse actually testified that his role in implementing sales plans was to physically place the products out in the store as directed by Cumberland's sales plans:  "Yes. When there's a sales program by out by corporate, I – I conform and put it out, yes."  LaCasse Tr. 21:20-24. Cumberland did not quote LaCasse's complete testimony in its SOF but rather cagily stopped quoting his testimony at the word "Yes."  Def. SOF ¶ 98.  Other examples of Cumberland's unreliable citations are discussed below at pages 19 to 24, below.

In addition to the many disputed facts, Cumberland conveniently ignores Cumberland's own admissions, Plaintiffs' contrary testimony, and the numerous facts that affirmatively support

Plaintiffs' claims, which a jury could rely upon to render a verdict for Plaintiffs. For example, Cumberland *admitted* that Plaintiffs' "**primary job duties**" which "**are performed on a frequent basis**" – a core element of the FLSA's executive exemption analysis, *see* 29 C.F.R. § 541.200; 29 C.F.R. § 541.700(a) – include numerous non-exempt and manual labor tasks such as "wait[ing] on and assist [ing] customers," "operat[ing] equipment including the cash register, gas console, lottery and money order machines," "bag[ging] groceries for customers [which] may require lifting up to 8 pounds," "prepar[ing] coffee and keep[ing] coffee bar clean," "chang[ing] bags of milk and cream in dispensers," and "stock[ing] food service equipment and keep[ing] food service area clean." Plaintiffs' Statement of Facts ("SOF") ¶ 314 (emphasis added). Cumberland also ignored its Rule 30(b)(6) designees' admissions that Cumberland issues countless policies and procedures that direct exactly how stores must operate, the manner in which Plaintiffs needed to perform non-exempt work, and that Cumberland micromanages Plaintiffs through multiple levels of supervisors and corporate control. *Infra* at 11-19. Cumberland further ignored Plaintiffs' testimony about how they worked long hours each week primarily performing the same duties as the hourly employees who received overtime pay. *Infra* at 7, 11. These facts and many others contained in Plaintiffs' SOF and responses to Def. SOF support Plaintiffs' claim that they are entitled to overtime pay and were misclassified as exempt executives. *See infra* at 4-19.

Consideration of the entire record before the Court leads to one inexorable conclusion: a plethora of disputed facts exist as to the FLSA's executive exemption which preclude summary judgment. In reversing a summary judgment decision in the employer's favor in an FLSA overtime misclassification case involving retail store managers (like this case), the First Circuit made clear that the FLSA "primary duty [analysis] cannot be determined as a matter of law" in a

case involving nearly identical factual disputes as this case. *See Marzuq v. Cadete Enters.,* 807

F.3d 431, 435 (1st Cir. 2015). For the reasons set forth herein and in Plaintiffs' SOF,

Cumberland's Motion must be denied.

## II.    PROCEDURAL HISTORY

Plaintiffs claim that Cumberland misclassified LSMs as exempt from the FLSA's

overtime pay requirements and that Cumberland owes them and other LSMs overtime pay and

other damages. Second Amended Complaint (D.E. 42) at ¶¶ 15-31. The Court conditionally

certified this case as a collective action per the parties' stipulation. Order (D.E. 41). The parties

conducted first-phase discovery which was focused primarily on the claims of the Phase I

Plaintiffs and Cumberland's affirmative defenses. Order (D.E. 115). Following the close of the

first phase of discovery, Cumberland moved for summary judgment claiming that the FLSA's

executive exemption bars six of the Phase I Plaintiffs' claims and that Cumberland has met its

burden as to the first and third prongs of the executive exemption as to all Plaintiffs. D.E. 180.

Plaintiffs oppose Cumberland's Motion due to numerous disputed factual issues and the law

favoring Plaintiffs. Plaintiffs also move for partial summary judgment for an order holding (1)

that Plaintiffs' regular and expected workweek was comprised of 50 hours and (2) that

Cumberland cannot demonstrate a good faith defense to avoid the imposition of liquidated

damages.

## III.    STATEMENT OF FACTS

Cumberland's Motion quite tellingly leaves out numerous material facts and corporate

admissions that undermine Cumberland's Motion. These facts highlight how Plaintiffs were

misclassified as exempt, like the retail store managers in *Morgan v. Family Dollar Stores*, 551

F.3d 1233, 1264 (11th Cir. 2008) (affirming jury verdict finding that store managers were

misclassified as exempt).

### A. Cumberland Knew that LSMs Primarily Perform Non-Exempt Duties.

Cumberland's Rule 30(b)(6) witness, David Merriam, readily admits that LSMs[2] perform

non-exempt duties:

> Q:    Do store managers make coffee?
> A.    Yes.
>
> Q:    Do store managers perform customer service?
> A:    Yes.
>
> Q:    Do store managers work on the cash register?
> A:    Yes.
>
> Q:    Do store managers stack and rotate products?
> A:    Yes.
>
> Q:    [Do] store managers clean stores?
> A:    Yes.
>
> Q:    [Do] store managers bag groceries?
> A:    Yes.
>
> Q:    [Do] store managers sell Lotto tickets?
> A:    Yep. Yes.
>
> Q:    [Do] store managers change bags of milk in the coffee area?
> A:    Yes.
>
> Q:    [Do] store managers sweep and mop floors?
> A:    Yes.
>
> Q:    [Do] store managers hang signs?
> A:    Yes.
>
> Q:    [Do] store managers wash windows?
> A:    Yes.
>
> Q:    [Do] store managers change price tags?
> A:    Yes.

---

[2] The terms "LSM" and "Store Manager" are used interchangeably in this brief but all refer to the Legacy Store Manager position at issue in this case.

> Q:    [Do] store managers operate equipment including cash register, gas console, lottery, and money order machines?
> A:    Yes.

SOF ¶ 310.

Cumberland's Rule 30(b)(6) witness, Corey Bellrose, testified that Cumberland performed a "Job Analysis" of the Store Manager position in July 2013.  SOF ¶¶ 311-315.  The Job Analysis assessed the Store Manager job and described the "Tasks Performed," "Education or Training Required," the "primary duties," the "secondary duties," the "machine[s] and tools" used, and the "physical demands of the job."  SOF ¶¶ 312, 314, 317.  Notably, the Store Manager and Assistant Manager (which is a non-exempt and overtime eligible position) have the **exact same** Job Analysis.  *Id*.

Cumberland's Job Analysis highlights the non-exempt, manual labor nature of the Store Manager position and how significant non-exempt duties are for the Store Manager job.  According to Cumberland, the Store Managers' "**primary duties**" which "**are performed on a frequent basis**" include "wait[ing] on and assist [ing] customers," "operat[ing] equipment including the cash register, gas console, lottery and money order machines," "bag[ging] groceries for customers [which] may require lifting up to 8 pounds," "prepar[ing] coffee and keep[ing] coffee bar clean," "chang[ing] bags of milk and cream in dispensers," and "stock[ing] food service equipment and keep[ing] food service area clean."  SOF ¶ 314.  Cumberland admitted that these are the Store Managers' primary duties:

> Q:    [D]o you agree that the primary duties of the store manager position that are performed on a frequent basis are listed in this document under the "Primary Duties" section?
> A:    Yes. Yes.

SOF ¶ 315.

Cumberland's Job Analysis exemplifies how physically demanding the LSM job is.

6

LSMs perform the following tasks "frequently:"

- "lifting – floor to waist frequently to stock shelves, clean, perform inventories, retrieve bags or items below the counter,"

- "lifting – waist to shoulder frequently to bag items, run lottery and money order machines, perform inventories, make coffee, clean,"

- "lifting – shoulders and above frequently to get items out of overhead rack," and "twisting frequent to reach items behind the register and stock shelves."

SOF ¶ 316.  LSMs must possess the "physical requirements" to be able to "lift 40 lbs., reach overhead, bend, squat, twist, reach, grasp and grip," "to stand/walk 10 hours a day," and to work in coolers.  SOF ¶ 318.  LSMs must also use the "cash register," "food service equipment," "lottery terminal," "gas console," "gas stick," "credit card," "money order," and "soda and coffee" machines.  Store Managers also use the "mop," "broom," "snow shovel," "cleaning supplies," "case cutter," "safety cones," and "price gun."  SOF ¶¶ 310, 314, 317.

Consistent with Cumberland's admissions and corporate documents, Plaintiffs testified that they primarily performed non-exempt job duties such as making coffee, performing customer service, cleaning, stocking products, setting up and rearranging product displays, working on the cash register, hanging signs, unloading delivery trucks, and putting price tags on products.  SOF ¶ 319.  Plaintiffs have a glorified title but perform the same work as the hourly employees who are entitled to overtime pay.  Indeed, Plaintiffs often substitute for hourly employees as they must fill in for hourly employees who call out sick if a replacement is not available.  SOF ¶ 320.

**B.    Cumberland Took No Action to Prevent Store Managers from Frequently Performing Non-Exempt Duties and Manual Labor.**

Dawn Clark, Cumberland's Human Resources Manager, expressed concern that LSMs

perform more non-exempt duties than the Store Managers who work in AIM[3] model stores:

> Currently we have only one job description (and position structure) for the Store Manager position. While we have discussed the need to have versions for our Store Manager position; one for a legacy location and one for an AIM location, we have not made this move yet. **Once we do this, it will become more apparent how much more non-exempt duties that the legacy SM is performing to keep his/her store operating, so we will need to discuss this as a team before making this decision.**

SOF ¶ 321.  Despite Ms. Clark's concerns and Cumberland's knowledge that LSMs' "primary duties" included so many non-exempt duties and manual labor tasks, Cumberland did nothing to change the LSM job to prevent LSMs from "frequently" performing so many non-exempt tasks.

SOF ¶ 322.  Defendant's Rule 30(b)(6) testified:

> Q:    Do you ever recall receiving an e-mail from Dawn Clark indicating that it became more apparent that legacy store managers perform more non-exempt duties than AIM store managers?
>
> A:    I do recall her evaluating, or as part of maybe that career project that she was working on, that she may have felt they were performing more non-exempt duties than AIM store managers.
>
> …
>
> Q:    Did Cumberland Farms take any steps to address the issue raised by Ms. Clark that legacy store managers spend more time in non-exempt duties than AIM store managers?
>
> A:    No.
>
> …
>
> Q:    Was there ever any discussion about reclassifying legacy store managers to non-exempt status?
>
> A:    Never
>
> …
>
> Q:    Did Cumberland Farms take -- do any analysis to ensure that legacy store managers were properly classified after receiving this e-mail from Ms. Clark?
>
> A:    No.

SOF ¶ 322.[4]  Cumberland knew LSMs primarily performed many non-exempt tasks and turned a blind eye because having LSMs perform non-exempt work was critical to the success of

---

[3] Cumberland's AIM model stores typically have more staff and they prepare and serve food.  SOF ¶ 321 n.4.  AIM Store Managers are not a part of this lawsuit.

[4] Ms. Bellrose speculated that Cumberland may have provided more labor hours to legacy stores but then conceded she did not know if that happened.  SOF ¶ 322 n.5.

Cumberland's business model – staff stores leanly, keep payroll costs low, and have LSMs work as long as needed to avoid exceeding the labor budget. *See infra* at 10-11.

     **C.**    **Cumberland Admits that Store Managers Do Not Perform Many Managerial Tasks.**

Highlighting how little managerial authority and discretion LSMs have, as admitted by Defendant's Rule 30(b)(6) witness, David Merriam, LSMs do not perform (or have no say in) many managerial tasks:

> Q:    Are legacy store managers involved in deciding when sales promotions occur?
> A:    No managers are involved when deciding when [*sic*].
>
> …
>
> Q:    And legacy store managers do not decide the price to charge for products in the stores; is that right?
> A:    They do not.
>
> …
>
> Q:    Do they decide when products go on sale?
> A:    They do not.
>
> …
>
> Q:    Do legacy store managers decide which products are sold in the stores?
> A:    They do not. They can make recommendations.[5]
>
> …
>
> Q:    And do legacy store managers decide where to hang signs in stores?
> A:    Again, they should be following the schematic [the corporate design layout].
>
> …
>
> Q:    [Do] store managers negotiate on behalf of Cumberland?
> A:    Negotiate with who?
>
> Q:    Vendors, for example.
> A:    By rule they should not be, no.
>
> Q:    [Do] store managers enter into contracts on behalf of Cumberland?
> A:    No.
>
> Q:    [Do] store managers select which outside vendors to hire?
> A:    No.

---

[5] When pressed on how often any LSM makes recommendations, Mr. Merriam testified, "I don't know that there's any quantifiable answer to that," calling into question whether such recommendations occur with any regularity as required by law. SOF ¶ 323 n.6; 29 C.F.R. § 541.105 ("To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include . . . the frequency with which such suggestions and recommendations are made or requested. . .").

SOF ¶ 323.  Store Managers cannot set pay rates for store-level employees outside of Cumberland's predetermined zones without supervisor approval.  SOF ¶ 325.  Cumberland does not even allow Store Managers to control the temperature in their stores.  SOF ¶ 326.

Cumberland also decides how much money to provide its stores for payroll in the form of labor hours.  SOF ¶ 324.  Store Managers cannot exceed the provided labor hours:

> A:    The store manager is responsible to schedule their team within the allocated hours to the store.
>
> Q:    Are store managers directed not to exceed the allocated hours?
> A:    Store managers should not be exceeding allocated hours.

SOF ¶ 324.

Moreover, at pages 11 to 19 below, Plaintiffs address many additional tasks that LSMs do not perform and tasks over which Cumberland exercises comprehensive control through its policies and procedures, making the LSM job routine and repetitive and stripping LSMs of the necessary discretion needed to be classified as exempt.  *See* 29 C.F.R. § 541.106(a) ("An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.").

**D.    Cumberland's Limited Labor Budget for Stores and Policy Not to Allow Stores to Exceed the Labor Budget Causes LSMs to Perform Non-Exempt Duties Due to Lack of Staffing.**

*1.    Cumberland Provides Stores with a Bare-Bones Amount of Labor Money Causing LSMs to Perform Non-Exempt Work and Work Overtime Hours.*

Cumberland  – not LSMs – establishes the store labor budget.  SOF ¶ 393.[6]  Cumberland provides the labor budget to stores in the form of hours.  SOF ¶ 394.  District/Area Sales Managers ("ASMs") "can recommend a change in those hours."  SOF ¶ 395.  LSMs cannot exceed the provided labor budget or allow employees to work overtime hours unless ASMs

---

[6] Rose Donnell is Cumberland's "Retail Administrative Manager" and Sheree Beisner is Cumberland's "Director of Retail Training." SOF ¶ 393 n.9.

approve such hours.  SOF ¶ 397.

LSMs testified that Cumberland did not provide sufficient labor money to run the stores.

SOF ¶ 396.  As a result of the limited labor hours provided and prohibition on overtime pay for

hourly employees, LSMs testified that stores were understaffed and the understaffing caused

them to perform hourly (non-exempt) duties.  SOF ¶ 398.  Rather than address the understaffing

issue, Cumberland admitted that it paid LSMs $█ "if you controlled your labor cost.  You

control your labor costs by not exceeding your hours by not using overtime."  SOF ¶ 399.

> 2.    *Plaintiffs Work Long Hours Pursuant to Cumberland's Direction that SMs Must Work at Least 50 Hours Per Week.*

Cumberland mandates that its Store Managers work "50 regular hours" per week and "10

hour work days."  SOF ¶ 400.  Store Managers often work more than 50 hours in a week.  Def.

SOF ¶¶ 20-31 (Defendant admitting Plaintiffs worked between 47.70 to 58.49 hours per week,

on average).

**E.    Cumberland Controls All Aspects of the LSMs' Job and How Its Stores Operate through Comprehensive Policies, Procedures, and Supervisor Control, Including Directing LSMs to Perform Non-Exempt Job Duties.**

Cumberland's corporate office creates common policies and procedures that direct how

stores must operate and how LSMs must perform their duties, stripping them of any

"managerial" discretion and forcing them to "perform uniform, cookie-cutter tasks mandated by

a one-size-fits-all corporate manual."  *Morgan*, 551 F.3d at 1264.  LSMs must follow

Cumberland's policies and procedures or they can be disciplined or terminated.  SOF ¶ 328.

Cumberland's policies dictate how, among other numerous things, LSMs must perform customer

service, clean, stock products, make and sell coffee, order products, and set up products

according to Cumberland's directives.  SOF ¶¶ 329-380.

In addition to the written policies, procedures and manuals, Cumberland also issues

directives through Marketing Updates, PACT messages, and e-mails.  Marketing Updates, sent

by Cumberland's Marketing Coordinator, set the prices of products, provide directives on where

to hang signage and where to display products, and decide which products are going on sale and

when promotional events will occur, etc.  SOF ¶ 330.  PACT is a communication system

between the corporate office and stores which provides updates and work assignments.  SOF ¶

331.  "The store manager or team member will confirm that they either read [the PACT message]

if it's just an FYI item, or if it's action oriented that they completed the project."  *Id*.

Cumberland constantly monitors whether stores complete assigned PACT tasks.  SOF ¶ 332.

LSMs also receive e-mails from their supervisors (the ASMs) and other corporate-level

employees that direct them how to perform their work.  SOF ¶ 333.

　　　　While Plaintiffs could fill the rest of this brief with evidence demonstrating

Cumberland's control and micromanagement of its LSMs and stores, Plaintiffs discuss the

policies and procedures which highlight this point.  For example:

**Cumberland Directs How to Perform Customer Service (SOF ¶¶ 334-339)**

- 　　"Store Managers must provide customers with fresh product, quick and friendly service, in a clean, well-lit, fully stocked store."

- 　　When a customer enters the store, Store Managers and all other team members must "greet[] customers with a smile and a "Hello" and "look directly at customers and make an effort to learn the names of regular customers."  "Use Suggestive Selling" and "Promote Cumberland Farms brand products."

- 　　Follow the "GREAT" program:  "<u>G</u>reet every customer"; "Offer each customer a <u>R</u>eceipt;" "Make <u>E</u>ye contact with each customer;" "<u>A</u>sk the customer if they need anything else;" and "<u>T</u>hank each customer for their business and invite them back."

- 　　Cumberland even dictates how many inches of space (30) "must be available at the checkout for customers to conduct their transactions" to make customers comfortable.

**Cumberland Directs How to Clean the Store's Interior and Exterior and Perform Maintenance (SOF ¶¶ 340-348)**

• Cumberland mandates when food service equipment must be cleaned and directs LSMs to "use the following schedule" at Ex. 25 (CF_28656-28658). This schedule dictates precisely when equipment must be cleaned and how to clean each piece of equipment, micromanaging the slightest details, such as using "Citrus All Purpose Cleaner," "wipe scissors with Thermo-scan wipes," "Dip BIB connectors in . . . warm water for 2 minutes," etc.

• Cumberland also directs LSMs to perform maintenance. Maintenance problems "correctable by the Store Manager" are: "Cash Register Not Working;" "Air conditioner not working;" "Heat not working;" "Lights smoking;" "Ice cream freezer not working;" etc.

• "Cleanliness is a must. A neat, **clean**, well-stocked store is a crucial step in customer service."

• "Store Exterior" – "Keep the parking lot litter-free. Check for weeds and make sure the grass is cut. In the winter, traffic areas must be free of snow and ice."

• "Banners and other authorized signs should be properly displayed. Keep window shelves free from clutter."

**Cumberland Directs How to Display Products (SOF ¶¶ 350-355)**

• "The manner in which a product is marketed and merchandised greatly affects the actual sales of that product. Use the following strategies to increase the sales of all products, particularly, high profit items."

• "Place merchandise in the store according to the Plan-O-Grams issued by the marketing department." Plan-O-Grams are "design layouts to offer uniformity from our stores, which you as a consumer appreciate when you go to a store and you say, Oh, yeah. I see this in all their stores."

• "Make sure the store is set up to Plan-O-Gram and don't run out of product."

• "Keep all displays faced, rotated and clean." "Never run out of milk!"

**Cumberland Micromanages Coffee Sales (SOF ¶¶ 357-360)**

• Cumberland directs LSMs to "[a]lways keep the coffee area clean, organized and stocked. Make the area look inviting to customers."

• "Clean all coffee equipment daily" and "[h]ave every coffee flavor available during all hours of operation."

- "Keep the cream dispenser clean and full. Check the machine three times a day to make sure it is keeping the cream cold."

## Cumberland Controls How the Store Office Is Setup (SOF ¶¶ 361-363)

- "All personal affects stored at their appropriate location in the Communication Hub."

- "All store-specific reminders have been placed on the bottom rail in the Communication Hub."

- "Any files, forms, etc. have been filed to the appropriate folder in the cabinet."

## Cumberland Controls the Dress Code (SOF ¶¶ 364-366)

- "Retail Store/Station Managers and all hourly non-exempt retail employees are required to wear a Company logo shirt, tan or black pants (including tan and black jeans) and name badge at all times while on duty."

- LSMs do not even have authority to allow their employees to untuck their shirts. "Company shirts must be worn while on duty and males must have their shirts tucked in unless the tucking is waived by the Regional Manager."

- The Human Resources Department must approve any deviations from Cumberland's dress code.

## Cumberland Directs How to Order and Stock Products (SOF ¶ 367)

- "Following proper ordering techniques will ensure product availability to the customer." "All coolers, freezers, shelves and displays must be kept fully stocked."

## Cumberland Directs How to Accept Product Deliveries (SOF ¶¶ 368-369)

- Cumberland has a 16-step process for bakery deliveries, a 12-step process for ice cream deliveries, and a 13-step process for grocery deliveries.

- Cumberland also controls when and how often deliveries occur. "Cumberland Farms Bakery deliveries are made twice a week to those stores services by the Westboro Bakery. The deliveries are either Monday and Thursday or Tuesday and Friday." "The store will receive an ice cream delivery every other week (there are some stores that receive deliveries weekly." Grocery deliveries occur twice per week.

## Cumberland Directs How to Interview, Discipline, and Terminate Employees (SOF ¶¶ 370-379)

- Cumberland has a seven-step interview process: "1. Scheduling the Interview. 2.

14

Preparing for the Interview.  3.  Conducting the Interview.  4.  Checking Employment References.  5.  Scheduling a Second Level Interview.  6.  Making an Employment Offer. 7.  Rejecting Applicants."

- "To simplify the [interview] process, the Company has adopted a more comprehensive and streamlined program called the 'Store Managers Standard Interview.'"  "The Standard Interview consists of interview questions developed to assist in the interview process."  The "standard interview questions" are on a "laminated card" and "**MUST** be used for every interview you conduct."

- Cumberland automates the interview process instructing LSMs that "[h]aving a list of planned interview questions will allow you to focus on the candidates' responses because you don't have to worry about your next question."

- "The Area Sales Manager must complete the Recommendation section of the Application Review/Interview Evaluation Form for all applicants who are interviewed (after the second level interview."

- Regarding discipline, Cumberland details the steps in its "Progressive Counseling" process which start with a "Counseling Session," followed by "Written Warnings," "Disciplinary Suspension," "Final Reprimand," and "Termination."  Cumberland suggests discipline for various policy violations.

- LSMs cannot terminate employees.  "[D]o not terminate an [*sic*] team member without first consulting your Area Sales Manager."  "Area Sales Manager[s] will check to make sure that the problem was properly documented and the team member was given every opportunity to improve their performance."

Cumberland also directs how to schedule employees through the "It's About Time" scheduling software.  Pls. Response to Def SOF ¶¶ 3, 9.  "It's About Time" creates a recommended schedule for each store to "mak[e] it easy to complete a weekly schedule that ensures proper staffing for optimal customer service."  *Id.*  Defendant mandates that Store Managers "[s]chedule employees for each day as closely as possible to the recommended schedule . . . ."  *Id.*; Ex. 33.  Defendant reiterates that the "goal is to have Store Managers closely follow the recommended schedule and use the remaining double coverage hours for delivery times so that we provide the quickest customer service possible."  Ex. 33 at CF_28005.

Cumberland has many other policies and procedures that define how LSMs must perform

15

their duties and control precisely how its stores operate, including policies and procedures for controlling inventory and vendor theft, preventing shoplifting, store safety, and loss prevention. SOF ¶ 380.  As in the *Morgan* case in which Family Dollar's store managers were found to be misclassified as exempt, Cumberland's "store managers lack discretion over the store's merchandise selection, prices, sales promotions, and layouts - all [of which] are set by the home office and district managers."  551 F.3d at 1250.  Such comprehensive control over "the tiniest of details" supports Plaintiffs' claims that LSMs did not have the freedom of supervision required to be exempt employees.  *Id.*; *accord Marzuq*, 807 F.3d at 443; 29 C.F.R. § 541.704 ("The section 13(a)(1) exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.").

**F.    Cumberland Trains LSMs to Perform Non-Exempt Duties**

In addition to its comprehensive policies, Cumberland provides training to LSMs both while employed as LSMs and while training to be LSMs teaching them to perform their work the Cumberland way.  SOF ¶¶ 381-383.  While Cumberland never produced the actual training modules and documents for LSMs and the production of such modules and training documents is the subject of Plaintiffs' pending Motion to Compel (D.E. 167), Cumberland produced a list of training courses that LSMs received and referenced courses in other documents.  These documents show that Cumberland trained LSMs to perform non-exempt duties including making coffee and tea, processing customer transactions, preparing and serving food, displaying and maintaining food and products, restocking products and supplies, maintaining a clean store, and maintaining equipment.  For example, Cumberland has a 4 part "Coffee and Tea Store Manager Training Program."  SOF ¶ 382.  "The completion of the 'Coffee and Tea Store Manager

Training Program DVD & Assessment' is currently for **<u>Store Managers ONLY!</u>**" *Id.* Other

such training modules include: Planogram Pride; Food Safety Certification; Credit/Debit Card

Processing Awareness Training; and BEST Coffee Program Knowledge Review.[7]  SOF ¶ 383.

> **G.    Cumberland Also Controls LSMs Through Multiple Levels of Supervisors Who Ensure that LSMs Comply with Cumberland's Policies and Procedures and Who Make the True "Managerial" Decisions at Cumberland.**

Cumberland's corporate headquarters are located in Westborough, Massachusetts.  SOF ¶

384.  There are numerous departments at corporate headquarters that create the policies and

procedures for how stores operate, select the products sold in the stores, set the prices of

products, etc.  SOF ¶ 385.  There are multiple levels of supervisors above the LSMs who run

Cumberland's stores.  The chart below demonstrates the reporting hierarchy:



SOF ¶ 386.

LSMs' direct supervisors, the ASMs, truly manage Cumberland stores and are constantly

involved in store operations and personnel matters.  Their duties include:

- "Directs and oversees all store personnel to achieve Region, Division and Corporate net profit performance objectives.

- "Is responsible for the overall engagement and productivity of a wide network of retail stores and oversees many aspects of their day to day operations as well as creating a work

---

[7] Plaintiffs respectfully reserve the right with Court permission to supplement these arguments after the Court's decisions on the pending motions to compel.  D.E. 167-169.

environment that supports and promotes employee engagement . . . ."

- "Manpower strategic planning for area to include staffing, development and management of all store level personnel."

- Profit and loss "management for 10-13 locations through monitoring of current sales, expenses, store labor costs and inventory controls."

- "Personnel management to include, motivating and coaching Store Managers through team evaluation process and partnering with HR Business Partner on employee related matters."

- "Weekly store visits to ensure compliance with Corporate and Division Standards with regard to store conditions, store promotions and operational procedures."

- "Handling terminations" and "coaching disciplinary action."

- Handling store "promotions & development."

- "Ensure all store controls are in place."

- "Reviewing reports and verifying deposits."

- "Handling customer complaints."

- "Coaching and reviewing" the "hourly performance appraisals."

SOF ¶ 387.

ASMs are in stores daily and visit each store in their district at least once every two weeks. SOF ¶ 388. ASMs do not have offices, as Cumberland requires that "95% [of their time] will be traveling to and from store locations." SOF ¶ 389. During store visits, ASMs perform "evaluation walkthroughs" to evaluate "store conditions including restrooms, stock levels, proper signage in/out, plan-o-grams and displays, backrooms and coolers, [and to] review Guest Shop items." SOF ¶ 390. They also conduct "night visits to interact with Team members." SOF ¶ 391. The ways in which Cumberland's ASMs micromanage the LSMs is nearly identical to the district manager in the *Marzuq* case in which the First Circuit reversed a district court's summary judgment decision in the employer's favor because of the ways in which

the district manager closely supervised the store manager.  807 F.3d at 434, 443 (district manager determined staffing levels, arranged maintenance, visited stores, checked for compliance with policies, was involved in firing decisions, set the store budgets, handled customer issues, and authorized terminations).

In addition to the ASMs, high-ranking corporate executives visit stores to enforce compliance with Cumberland's policies.  SOF ¶ 392 (discussing supervisors and executives who visit stores).  From the top down, Cumberland monitors, oversees, and micromanages the ways in which its stores operate and how LSMs perform their work.

### H.    Relationship between Salaries and Hourly Employee Pay

When comparing Plaintiffs' salaries to the hourly employees' pay in their stores, Plaintiffs either earn less or just marginally more per week and per hour than the hourly employees for the same number of hours worked:

- Charak $808.09/week; Hourly Rate of Pay:  $13.81
  Hourly Employee: $931.49/week; Hourly Rate of Pay:  $15.93

- Mitchell $961.82/week; Hourly Rate of Pay:  $17.32
  Hourly Employee: $942.43/week; Hourly Rate of Pay:  $16.98

- Burdick $958.73/week; Hourly Rate of Pay:  $20.10
  Hourly Employee:  $902.12/week; Hourly Rate of Pay:  $18.91

- Marquette $958.21/week; Hourly Rate of Pay:  $18.73
  Hourly Employee:  $825.34/week; Hourly Rate of Pay:  $16.41

- Jalbert $844.67/week; Hourly Rate of Pay:  $15.34
  Hourly Employee:  $747.95/week; Hourly Rate of Pay:  $13.58

- Lacasse: $1,080.06/week; Hourly Rate of Pay:  $20.34
  Hourly Employee:  $865.14/week; Hourly Rate of Pay:  $16.29

SOF ¶¶ 402-420.

**IV.    SETTING THE RECORD STRAIGHT**

>    **A.    Cumberland's Motion for Summary Judgment Is Replete With Misrepresentations of the Record.**

Before addressing Cumberland's failure to prove that the asserted executive exemption "plainly and unmistakably" meets the FLSA's requirements and bars Plaintiffs' claims, it is important to denote Cumberland's mischaracterizations of, and dubious citations to, the factual record.  Under the First Circuit's jurisprudence, Cumberland's distortions of the record are particularly significant in the summary judgment context.  In *Marzuq*, the First Circuit reversed summary judgment for the defendant on the executive exemption because the district court had "gloss[ed] over a clear factual dispute" concerning the plaintiff's primary duty. 807 F.3d at 438. Although the plaintiff in *Marzuq* at one point characterized his role of manager as being "captain of the ship," *id*. at 434, the First Circuit took a holistic view of the record.  *Id.* at 440.  Upon "closely examining the record evidence" the First Circuit concluded that, based upon the plaintiffs' *complete* testimony, including his testimony regarding non-exempt duties, disputed genuine issues of material fact precluded summary judgment.  *Id*. at 447; *In re Smith & Wesson Holding Corp. Sec. Litig*, 836 F. Supp. 2d 1, 11 (D. Mass. 2011) (a party cannot "cherry pick" the record to avoid disputed issues of fact).

In an attempt to devise a record favorable to summary judgment, Cumberland distorts the record in at least three distinct ways.  One, Cumberland "cherry picks" Plaintiffs' testimony, citing the portions it believes to be favorable, while omitting the portions that create issues of fact.  Two, Cumberland completely disregards the fact that its own corporate representatives and documents refute Cumberland's position, or at the very least create genuine issues of material

fact.  Three, Cumberland attempts to disavow the testimony of its own corporate representative

by relying on his contradictory declaration.[8]

**B.    Cumberland Improperly Cherry-Picks Plaintiffs' Testimony, Ignoring Adverse Testimony.**

Cumberland cites selected portions of Plaintiffs' testimony, while ignoring testimony

from the same witness that unquestionably creates issues of fact:

- Cumberland states that Plaintiff "LaCasse was also responsible for implementing sales plans." Def. SOF at ¶ 98.  While Cumberland conveniently stops quoting LaCasse's answer at the word "Yes," it cagily omits LaCasse's complete answer.  LaCasse actually testified that his "responsibility" was to physically place the products out in the store as directed by Cumberland's sales plans; his full answer states: "Yes. When there's a sales program by out by corporate, I – I conform and put it out, yes.").  Clearly LaCasse's complete answer does not support the statement for which Cumberland references it.

- Cumberland takes Plaintiff Charak's deposition testimony out of context when it claims that "Charak was responsible for supervising all of her employees."  Def. SOF at ¶ 208. Charak actually testified that she was the "supervisor" of the hourly employees but considered herself equal to the other employees  -- "But a lot of times – we were all equal.  You know, I was ringing, and somebody else ordered. Or she was ringing and decided to order. Or send somebody in the cooler and tell me what we need and we scanned it."  Pls. Resp. to SOF at ¶ 208 (citing Charak Tr. 85:1-5). Cumberland also ignores that Charak unequivocally testified that she spent 80 to 85 percent of her time performing non-managerial tasks, such as running the cash registers.  *Id.* (citing Charak Tr. at 129:24-130:22).  Defendant also omits Charak's supervisor's role in running her store.  Charak Tr. 133:4-12 (Q. "What was Mr. Paulmeno's role with respect to your supervising -- with respect to your store?" A. "He would come down driving from Port St. Lucie, sometimes once a week, sometimes twice a week. He'd come in and take a look and make sure all the signage was up correct. And if it wasn't he'd say, Listen, you got the wrong sign here; put this up. If I was missing signs, he had had stuff in the car. Basically supervise."); 133:19-21 ("He was a big hands-on guy. He used to come in and do a lot."); (Q: "And so that was one to two times per week you would see Mr. Deeb as well?" A: "Maybe two or three, maybe more.").

- Cumberland claims that "according to [Plaintiff] Jalbert, as the Store Manager he was ultimately responsible for everything that went on in the store whether [he was] there or not." Def. SOF at ¶ 225.  Cumberland leaves out Jalbert's testimony that he "was the store manager as far as completing things 20 percent of the day.  The rest of the day, they could have changed my nametag to cashier." Jalbert Tr. at 147:14-148:3.

---

[8]  Importantly, the examples in this section are only illustrative of Cumberland's liberties with the record. Full review of the record demonstrates that Cumberland's Motion is replete with other examples.

- Cumberland states that Plaintiff "Marquette admits that his overall responsibility as Store Manager was to manager his team and grow the profits of his store." Def. SOF at ¶ 263. However, during that very same line of testimony, Marquette disagreed that these functions were his primary duty, testifying that his "main responsibility was making sure that the guests services experience was done properly, that the store was kept clean, that the coffee was always made, that the store was presentable at all times, that I did the orders along with help from . . . customer service associates." Marquette Tr. at 63:2-22.

- Cumberland selectively cites Plaintiff Burdick's testimony that she was "responsible for overall store operations." Def. SOF at ¶ 39. However, Cumberland disregards Burdick's testimony during the same line of questioning where she stated that she provided customer service such as "making coffee, stocking shelves, sweeping, [and] mopping," Burdick Tr. at 58:11-12, which raises factual questions regarding what Burdick was "responsible for" and what she actually did.

These examples demonstrate that Cumberland "has selectively chosen only the evidence that supports [its] argument, to the exclusion of the remainder of the record which suggests otherwise." *Grant v. Roche Diagnostics Corp*., No. 09 Civ. 1540, 2011 U.S. Dist. LEXIS 79994, at *28 (E.D.N.Y. July 20, 2011). Cumberland cannot win a summary judgment motion by cherry-picking evidence it deems favorable to the exclusion of all other unfavorable evidence and facts. *Marzuq*, 807 F.3d at 437-38.

### C.    Cumberland's Own Witnesses and Documents Raise Factual Issues.

Cumberland's own witnesses and documents create issues of fact precluding summary judgment. For example, Cumberland's Rule 30(b)(6) witness explicitly testified that LSMs performed non-exempt duties, including customer service, cleaning, stocking, and working on the cash register. *Supra* at 5-6 (citing Merriam Tr. 111:6-112:11). Similarly, Cumberland's own Job Analysis undermines its exemption arguments, showing that LSMs' "**primary duties**" which they "**performed on a frequent basis**" included but were not limited to, the following non-exempt duties: customer service, operating the cash register and lotto and money order machines, bagging groceries, preparing coffee, stocking the food and other products, and cleaning the store. *Supra* at 3, 6-7. Cumberland also chose not to take any steps to address the fact that LSMs were

frequently performing substantial non-exempt work. *Supra* at 8. Cumberland pretends these facts do not exist, neglecting to mention them in its Motion.

Cumberland also fails to address the testimony of its own witnesses regarding the managerial duties LSMs do **not** perform, which also support denial of summary judgment as they refute Cumberland's claims that LSMs were exempt managers. Merriam **admitted** that LSMs do **not** decide when promotions occur, what prices will be charged, when products go on sale, which products are sold in the store, etc. *Supra* at 9-10. LSMs also have no discretion to negotiate on behalf of Cumberland, or even to decide where to hang signs in stores or the temperature set in their store. *Supra* at 9-10. All of this testimony – again, from Cumberland's own witnesses – creates genuine issues of material fact as to Plaintiffs' primary duties, thereby requiring denial of summary judgment.

Cumberland also ignores its own extensive corporate policies which dictate how the legacy stores operate and restrict the LSMs' discretion to the point where it strips LSMs of any "managerial" discretion. *Supra* at 12-15 (discussing numerous such policies). Indeed, Cumberland micromanages its LSMs to the extreme of mandating how to prepare coffee, where to display products and hang signs, and how to perform customers service and clean the store. *Supra* at 12-15. Such evidence suggests that LSMs "perform uniform, cookie-cutter tasks mandated by a one-size-fits-all corporate manual" and a jury very well could find they were misclassified as exempt like the store managers in *Morgan*, 551 F.3d at 1264. Thus, the Court need look no further than the testimony of Cumberland's own witnesses and Cumberland's own corporate documents to find issues of material fact and deny summary judgment.

It bears repeating that these are but a few of the many examples throughout its Motion for Summary Judgment where Cumberland cites deposition testimony which does not support the

propositions stated by Cumberland.  These misrepresentations reflect the fact that the holistic

view of the record required by the First Circuit in *Marzuq* dooms Cumberland's Motion.

> **D.      Cumberland Cannot Rely on Merriam's Declaration Which Contradicts His
> Deposition Testimony and Creates Disputed Issues of Fact.**

Cumberland's attempt to recast Merriam's deposition testimony via citations to his self-

serving declaration is futile.  Merriam unequivocally testified at his deposition that LSMs

regularly perform non-exempt duties, are subject to countless company policies and procedures

that dictated how LSMs have to do their job, and cannot perform many managerial tasks, such

that they are not "running the store."  *Supra* at 5-6, 12-19.  Cumberland attempts to disavow that

testimony by relying on a declaration in which Merriam testifies that "[e]ach legacy store is run

by a Store Manager."  Def. SOF at ¶ 3.[9]  Cumberland cannot on summary judgment rely on

Merriam's declaration testimony that contradicts his deposition testimony. *Colantuoni v. Alfred*

*Calcagni & Sons, Inc*., 44 F.3d 1, 4-5 (1st Cir. 1994) ("[w]hen an interested witness has given

clear answers to unambiguous questions, he cannot create a conflict and resist summary

judgment with an affidavit that is clearly contradictory, but does not give a satisfactory

explanation of why the testimony is changed.").

**V.      ARGUMENT**

> **A.      Summary Judgment Standards.**

The purpose of summary judgment "is to pierce the boilerplate pleadings and assay the

parties' proof in order to determine whether trial is actually required."  *Wynne v. Tufts Univ. Sch.*

*Of Med.*, 976 F.2d 791, 794 (1st Cir. 1992).  The burden is on the moving party to show "that

there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[9] Notably, in the declaration, Merriam does not, as Cumberland claims, testify that Store Manager's "run"
the store.  Rather, in his declaration, Merriam specifically states that "[e]ach store is **overseen** by a Store
Manager," which is categorically different than what Cumberland claims.  (emphasis added).

judgment as a matter of law." *MacGilvray*, 585 F. Supp. 2d at 177.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011).  "The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor."  *Griggs-Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment for the defendant is appropriate only where "the evidence is so one-sided that no reasonable person could find in favor of the plaintiff." *Roberts v. TJX Cos*., No. 13 Civ. 13142, 2017 U.S. Dist. LEXIS 49175, at *21 (D. Mass. Mar. 31, 2017).

> **B.** **Summary Judgment in FLSA Exemption Cases.**

First and foremost, "[t]he question of how [employees] spen[d] their working time … is a question of fact." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *Nicholson v. Bangor Historic Track, Inc*., No. 11 Civ. 00347, 2013 U.S. Dist. LEXIS 25081, at *24 (D. Me. Feb. 25, 2011) ("It is for a fact-finder and not the Court to determine how the Plaintiff actually spent her work day, and the competing facts on these determinations preclude summary judgment for either the Plaintiff or the Defendant.").  "Deciding whether an employee is exempt must be a voyage through fact-bound waters.  Although there are great many stars of law to navigate by, the course turns on the facts of an employee's job duties." *Harris v. Dist. of Columbia*, 741 F. Supp. 254, 259 (D.D.C. 1990); 5 C.F.R. § 551.202(e) ("The designation of an employee as FLSA exempt or nonexempt must ultimately rest on the duties actually performed by the employee.").  Because it is a fact-intensive analysis, an employee's classification does not lend itself to summary judgment. *See MacGilvray*, 585 F. 2d at 179; *Cheng Chung Liang v. J.C. Broadway Rest., Inc.*, No. 12 Civ. 1054, 2015 U.S. Dist. LEXIS 122878, at *4 (S.D.N.Y. Sept. 15, 2015) ("[b]ecause inquiries into employees' FLSA-exempt status are fact-intensive, even

where there has been full discovery, courts are often reluctant to grant summary judgment based on an FLSA exemption.").[10]

Cumberland bears the burden of establishing that the Plaintiffs' job falls within the executive exemption. *Cash v. Cycle Craft Co., Inc.*, 508 F.3d 680, 683 (1st Cir. 2007). "Additionally, the remedial nature of the statute requires that **its exemptions be narrowly construed against the employers seeking to assert them and limited to those establishments plainly and unmistakably within the exemptions' terms and spirit**." *Id.* (emphasis added). There is a high burden on employers to prove that an exemption applies because the FLSA's purpose is "to spread employment more widely through the work force by discouraging employers from requiring more than forty hours per week from each employee." *Marzuq*, 807 F.3d at 445.

The FLSA's executive exemption applies when an employee is: (1) compensated no less than $455 per week; (2) the employee's "primary duty" is management; (3) the employee customarily and regularly directs the work of two or more employees; and (4) the employee has the authority to hire or fire, or her suggestions and recommendations regarding the same are given "particular weight." 29 C.F.R. § 541.100. "Each of these requirements must be met for the exemption to apply." *Marzuq*, 807 F.3d at 435. "A genuine dispute as to any of the four

---

[10] *E.g., Marzuq*, 807 F.3d 431; *Roberts*, 2017 U.S. Dist. LEXIS 49175; *Anderson v. Dolgencorp of New York, Inc.*, 2011 WL 1770301, at *24-41 (N.D.N.Y. May 6, 2011) (denying summary judgment in retail store manager misclassification case where the parties presented numerous competing factors weighing on the relative importance of exempt versus non-exempt work); *Indergit v. Rite Aid Corp.*, 2010 WL 2465488 , at *7 (S.D.N.Y. Mar. 31, 2010) (denying summary judgment in retail store manager FLSA misclassification case and explaining that due to the required fact intensive inquiry, courts are often reluctant to grant summary judgment based on the executive exemption); *Hood v. JeJe Enters., Inc.*, 207 F. Supp. 3d 1363 (N.D. Ga. 2016); *Mariche v. Phoenix Oil LLC*, No. 13 Civ. 00550, 2014 U.S. Dist. LEXIS 75476 (D. Ariz. June 3, 2014); *Green v. Harbor Freight Tolls USA, Inc.*, No. 09 Civ. 2380, 2013 U.S. Dist. LEXIS 119770 (D. Kan. Aug. 23, 2013); *Smith v. Heartland Auto. Servs.*, 418 F. Supp. 2d 1129 (D. Minn. 2006); *Cowan v. Treetop Enters.*, 120 F. Supp. 2d 672 (M.D. Tenn. 1999).

requirements [for the executive exemption] is sufficient to deny summary judgment." *Roberts*, 2017 U.S. Dist. LEXIS 49175, at *22.[11]

Cumberland must also prove that Plaintiffs' primary duty is management. 29 C.F.R. § 541.100(a)(2). The "primary duty" factors include "(1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 U.S.C. § 541.700(a) (numbering added).

### C.    Cumberland Has Not Plainly and Unmistakably Proven that Plaintiffs' Primary Duty is Management.

The First Circuit's *Marzuq* case is the leading and most recent executive exemption case, and is binding precedent on this Honorable Court. The facts in *Marzuq* are markedly similar to the instant case and carefully explain the FLSA's primary duty test (i.e., whether Plaintiffs' primary duty is management). In *Marzuq*, the First Circuit vacated the district court's summary judgment in favor of the employer on the executive exemption because of disputed issues of material fact. *Id*. at 433. The Court clarified its prior precedent in *Donovan v. Burger King Corp*., 672 F. 2d 221 (1st Cir. 1982), upon which Cumberland so heavily relies in its Motion. *Id*. at 436-439.[12]

The *Marzuq* plaintiff was a Dunkin' Donuts store manager. Notwithstanding the fact that plaintiff admitted to being "in charge" of the store, he also performed substantial non-exempt work, including substituting for crew members who were sick. *Id*. at 434. The *Marzuq* Court

---

[11] Plaintiffs do not dispute the $455 per week prong but dispute all remaining executive exemption requirements and the primary duty test.
[12] In addition to the factual distinctions, *Burger King* was decided on appeal from a bench trial; in contrast, on a motion for summary judgment the Court must construe the facts in Plaintiffs' favor. *See supra*.

emphasized that the admission by the manager that he was "in charge" was not dispositive. *Id*. Rather, the Court found that whether a putative manager's primary duty is management "depends both on whether they were **in fact** 'in charge' while at their stores and whether, in the particular circumstances of this case, their being 'in charge' compels the conclusion that management was their primary duty." *Id*. (emphasis added).

In making this determination, the First Circuit directed that district courts **must** examine each of the primary duty factors in § 541.700(a). *Id*. at 440 ("the primary duty question **cannot be answered** without the case-specific inquiry contemplated by [the] regulation.") (emphasis added).[13] The *Marzuq* Court then explained each of these factors in detail and held that where "the evidence is inconclusive on multiple factors in the primary-duty inquiry," summary judgment is proscribed. *Id*. at 444-45.

### a.    Relative Importance of Exempt Duties.

The *Marzuq* Court found that testimony -- like that present in this case -- that the named plaintiff spent the "bulk" of his workweek performing non-exempt work "permits the conclusion that, as a factual matter, his non-managerial work also was 'critical to the success of the restaurant,'" notwithstanding the employer's "formal employment documents . . . which portray[ed] the manager's duties as almost exclusively supervisory." *Id*.  Given this divergence between what the employer's *aspirational* duties may have been for its managers and the reality of the *actual* duties performed by managers, the *Marzuq* Court found that "factfinder could reasonably conclude that plaintiffs' exempt and nonexempt duties were equally important to the successful operation of the[] restaurants." *Id*. at 441; *see Roberts*, 2017 U.S. Dist. LEXIS 49175,

---

[13]   Citing out-of-Circuit precedent and ignoring *Marzuq*, Cumberland erroneously deems the §541.700(a) analysis as unnecessary. ECF No. 180 at 24.

at *28-29 ("employees who occasionally perform supervisory work do not automatically qualify for the exemption simply because they sometimes perform managerial tasks.").

Despite the fact that the *Marzuq* plaintiff "interviewed potential employees, trained new hires, and generally oversaw the day-to-day operation of the stores," the "bulk of [his] workweek was spent performing nonexempt work, including customer service and cleaning." 807 F.3d at 440. The same is true here. *Supra* at 7; SOF ¶¶ 319-320. While Plaintiffs performed some managerial duties, their "primary duty" according to Cumberland's own Job Analysis includes numerous non-exempt duties which LSMs perform on a "frequent" basis. Moreover, as in *Marzuq*, Cumberland "demanded that [plaintiffs] regularly perform tasks ordinarily assigned to hourly employees." *Supra* at 7-11. "Hence, whether the 'relative importance' of duties factor supports the overtime exemption cannot be determined without a factfinder's judgment on the impact of the plaintiffs' varied undertakings." *Marzuq*, 807 F.3d at 440; *Morgan*, 551 F.3d at 1270 ("The jury was free to weigh the relative importance of the store managers' managerial and non-managerial duties . . . .").

Even to the extent that Plaintiffs perform some managerial duties, the non-exempt, overtime-eligible Customer Service Leaders and Associates also perform such tasks like training store employees, running the store in the store managers' absence, ordering products, and opening and closing stores, highlighting the lack of relative importance of these tasks in the primary duty context. SOF ¶ 327. This factor supports Plaintiffs and, therefore, denial of Cumberland's Motion.

### b.    Amount of Time Spent on Exempt Work.

Regarding this factor, the *Marzuq* Court first considered the "relatively small portion of his workweek" spent performing exempt tasks, just like the Plaintiffs in this case. 807 F.3d at

441; *supra* at 7 (discussing amount of time Plaintiffs spent performing non-exempt work); *supra* at 6-9 (discussing Cumberland's admissions that Plaintiffs frequently performed non-exempt work). Because, as in *Marzuq*, "a factual dispute exists as to how much of [plaintiff's] workweek he actually was 'in charge' of his store," summary judgment must be denied. *Marzuq*, 807 F.3d at 442-43 (distinguishing *Burger King* where the court found after a bench trial that the assistant managers were "solely in charge of their restaurants and are the 'boss' in title and in fact.").

In addition, as in *Marzuq*, Plaintiffs' "supervisory role was, at least at times, overwhelmed by [their] non-managerial tasks" and there is a disputed issue of fact concerning the alleged performance of "concurrent" managerial/non-exempt duties. *Marzuq*, 807 F.3d at 442; *id.* at 439 ("a nominal 'manager' who spends nearly his entire shift doing the same work as his subordinates might not be able to simultaneously manage the store."); *Roberts*, 2017 U.S. Dist. LEXIS 49175, at *29-30 (where nonexempt duties dominate a putative manager's time, thereby producing an "inability" to manage, it cannot be said that nonexempt and exempt duties are being performed concurrently).

c.      **Freedom from Direct Supervision.**

While the *Marzuq* plaintiff had some autonomy over the day-to-day operations of the store, he was "unable to make any significant or substantial decisions on [his] own." *Id.* (citing *Burger King*, 672 F.2d at 227). For example, just like this case (see *supra* at 10-11), while the *Marzuq* manager created weekly schedules and determined how many hours to assign to particular employees, company directors set the store budgets and the district manager determined the overall staffing levels. *Id.* In addition, like here (see *supra* at 11-12), the manager was expected to follow uniform procedures. *Id.* The district manager also visited the

store to enforce company policies. *Id*.; *supra* at 18-19. The store manager's authority to problem solve was limited, including handling repairs and customer complaints. *Id*.; *Roberts*, 2017 U.S. Dist. LEXIS 49175, at \*38-42 (because the plaintiffs were "unable to make any significant or substantial decisions on [their] own" and because there were disputes of fact regarding "how closely supervised" they were, summary judgment was precluded.).

As set forth above, Cumberland micromanages Plaintiffs in numerous ways even beyond what occurred in *Marzuq*. Cumberland demands that "Store Managers closely follow the recommended schedule" from Cumberland's "It's About Time" scheduling program. *Supra* at 15. Cumberland's policies cover all aspects of store operations and Plaintiffs' jobs. Plaintiffs must follow the policies or face discipline or termination. *Supra* at 12-19. Multiple levels of corporate supervisors visit stores to enforce policies and send directives by e-mail and the PACT system. *Supra* at 18-19. Cumberland also sets pay rates and work rules for store employees. *Supra* at 10, 12-19. On this record, which is remarkably similar to the *Marzuq* case, the Court should deny Cumberland's Motion because this factor favors Plaintiffs. *Marzuq*, 807 F.3d at 444.

> **d.    Relationship Between the Manager's Salary and the Wages Paid to Hourly Employees for Similar Nonexempt Work.**

The fourth primary duty factor compares Plaintiffs' salaries to the wages paid to their hourly-paid co-workers who perform similar non-exempt work. 29 C.F.R. § 541.700(a). The *Marzuq* Court noted that the hourly employees' total compensation – including tips (if applicable) and overtime – must be included in making a "fair comparison." *Marzuq*, 807 F.3d at 444-45. For comparison purposes, a manager's weekly salary is broken down to an hourly rate by dividing the salary by the total hours worked. *Id*. at 444. When the respective wages are fairly compared, a two- or three-dollar difference between hourly rates of salaried store managers

and hourly employees would be considered "relatively small" and "the justification for exempting the manager from overtime pay is weakened." *Id*. at 444-45.

When using the correct wage comparison under *Marzuq*, Plaintiffs either earned less per week than their hourly co-workers or just somewhat more per week. SOF ¶¶ 402-420. The same is true when comparing hourly rates of pay between Plaintiffs and their hourly co-workers.[14] *Id.* Given the fact that hourly co-workers either have a higher hourly rate of pay or just a marginally lower hourly rate of pay, as in *Marzuq*, the "justification for exempting the manager from overtime pay is weakened." *Marzuq*, 807 F.3d at 444-45.

* * * *

Given that all of the primary duty factors support Plaintiffs, Plaintiffs "might most appropriately be characterized as part-time managers, full-time associates." *Roberts*, 2017 U.S. Dist. LEXIS 49175, at *45. Plaintiffs respectfully request that the Court deny Cumberland's Motion given the many disputed issues of fact as to the primary duty inquiry. *Id.*; *Marzuq,* 807 at 447 ("the evidence is inconclusive on multiple factors in the primary-duty inquiry. Hence, the plaintiffs' primary duty cannot be determined as a matter of law at this stage of the case."); *accord MacGilvray*, 585 F. 2d at 178; *Cruz v. Boston Litig. Sol*., No. 13 Civ. 11127, 2016 U.S. Dist. LEXIS 187470 (D. Mass. May 24, 2016).

### D.    Cumberland Has Not Plainly and Unmistakably Proven that Plaintiffs Customarily and Regularly Direct the Work of Two or More Employees.

In addition to the primary duty test just addressed, the regulations require that an exempt employee "must customarily and regularly direct the work of two or more [full-time or their

---

[14] Charak's Hourly Rate of Pay:  $13.81;        Hourly Co-Worker's Rate of Pay:  $15.93
Mitchell's Hourly Rate of Pay:  $17.32;        Hourly Co-Worker's Rate of Pay:  $16.98
Burdick's Hourly Rate of Pay:   $20.10;        Hourly Co-Worker's Rate of Pay:  $18.91
Marquette's Hourly Rate of Pay: $18.73;        Hourly Co-Worker's Rate of Pay:  $16.41
Jalbert's Hourly Rate of Pay:     $15.34;        Hourly Co-Worker's Rate of Pay:  $13.58
Lacasse's Hourly Rate of Pay:   $20.34;        Hourly Co-Worker's Rate of Pay:  $16.29

equivalent] employees." 29 C.F.R. § 541.104(a). Plaintiffs dispute that they "customarily and regularly direct the work of two or more employees." *Id.* Plaintiffs directed work on a very limited basis and frequently just relayed corporate directives to co-workers. Pls. Response to Def SOF ¶¶ 40-41, 52, 68, 70, 123, 174, 187, 208-209,245, 250, 294-295. Cumberland failed to show that the LSMs in the case actually "customarily and regularly direct[ed]" two or more employees in each workweek. Rather, Cumberland calculated averages for the number of hours employees worked in stores. D.E. 183 at ¶¶ 5-6. Such averages do not show whether Plaintiffs actually managed employees for at least 80 hours during every workweek. The Court should therefore deny Cumberland's Motion on this executive exemption prong. *Dole v. Papa Gino's of America, Inc*., 712 F. Supp. 1038, 1044-45 (D. Mass. 1989) ("The issue hinges on what supervisory activities the Associate Managers are actually performing. The defendant has failed to make any specific statements as to the number of hours the Associate Managers spend supervising each week, or even a more general description of the amount of supervision or the amount of time that the Associate Managers are in charge of a shift. . . . The defendant's failure to provide a detailed description of the Associate Manager's supervisory activities results in its failure to meet its burden of proof for this prong of the exemption test.").

      **E.**    **Cumberland Has Not Plainly and Unmistakably Proven that Plaintiffs Had Authority to Hire and Fire and/or Whether their Recommendations as to Hiring, Firing, Advancement, Promotion or any Other Change of Status of Other Employees Were Given Particular Weight.**

Plaintiffs do not have authority to fire employees. As Cumberland's Rule 30(b)(6) designee admitted, "My understanding is with all terminations, there is HR involved, just to make sure it's not a wrongful termination." Merriam Tr. 65:12-14. Moreover, Plaintiffs could only terminate employees if there was a violation of company policy. Burdick Tr. 33:21 (needed to follow Cumberland's progressive discipline policy prior to terminating employees); Mitchell

Tr. 47:12-13 (able to fire employee who "was a thief" and "broke company policy").  ASMs also "handl[e] terminations."  SOF ¶ 387.  Plaintiffs also cannot independently hire employees.  They must select a new hire from prescreened candidates that Cumberland's recruiter selected.  SOF ¶¶ 242, 288, 376.  Lacking authority to independently hire or fire, the Court must consider whether Plaintiffs' recommendations as to personnel matters were given "particular weight."  29 C.F.R. § 541.105.

"To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 C.F.R. § 541.105.  Cumberland has not presented any evidence in its Motion demonstrating "the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  Failing to submit evidence of undisputed facts on these exemption issues, the Court must deny Cumberland's Motion as to this executive exemption prong.  *Ocasio-Hernandez v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) ("To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial.").

<u>**CONCLUSION**</u>

Cumberland woefully fails to meet its very high burden to show that Plaintiffs are "plainly and unmistakably" properly classified as exempt and that there are no material facts in dispute as to the executive exemption issues.  That is because Cumberland cannot meet its burden.  Plaintiffs have presented this Court with nearly the identical evidence that led to a jury verdict

finding that store managers were misclassified as exempt in the *Morgan* case and resulted in a reversal of summary judgment decision against an employee in *Marzuq*.  Under the facts of this case, "a reasonable factfinder might be reluctant to characterize the 'part-time' managerial position as his primary duty for the company." *Marzuq*, 807 F.3d at 445.  Plaintiffs request that the Court deny Cumberland's Motion in its entirety, with the exception of the first prong of the executive exemption ($455 per week salary requirement) which Plaintiffs do not dispute.

## **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

### I.       INTRODUCTION

Plaintiffs request that the Court, pursuant to Fed. R. Civ. P. Rule 56, enter partial summary judgment in their favor finding (1) that Plaintiffs' regular and expected workweek was comprised of 50 hours and that Plaintiffs' compensation was intended to compensate them for 50 hours each week and (2) that Cumberland cannot demonstrate a good faith defense to avoid the imposition of liquidated damages.  Defendant's Answer to Second Amended Complaint (D.E. 44) at Tenth Aff. Defense ("In treating Plaintiffs and the individuals to whom they claim they are similarly situated as exempt from overtime pay requirements, Defendant acted in good faith.").

The undisputed evidence makes clear that Plaintiffs expected to work 50 hours per week and that their regular rates of pay (for damages purposes) should be calculated by dividing their weekly salary plus incentive compensation by 50 hours.  *See infra* at 37-38.

The undisputed evidence also shows that Cumberland did not act in good faith and failed to take the required steps to ensure that it correctly classified Plaintiffs as exempt while employed as LSMs.  Indeed, Cumberland flatly admitted, "We've never evaluated their day-to-day duties as it relates to their exemption status.  To go back to my original answer, we have

never evaluated legacy store managers for their exemption status, period." SOF ¶ 309 (citing

Bellrose Tr. 91:2-6). "[T]here is no policy. It's just not – it's never been looked at. It hasn't been

done. It hasn't changed. There's been no analysis …." SOF ¶ 309 (citing Bellrose Tr. 96:9-19).

Cumberland also admitted that it did nothing to ensure that LSMs were correctly

classified as exempt despite knowing that LSMs perform non-exempt work. SOF ¶ 309 (citing

Bellrose Tr. 89:5-8 ("Q: Was any analysis of the legacy store manager position ever done

regarding the way in which it's classified as exempt? A: No."), 70:12-18 ("Did Cumberland

Farms take any steps to address the issue raised by Ms. Clark that legacy store managers spend

more time in non-exempt duties than AIM store managers? A: No."), 88:8-12 ("Q: Did the

company do anything independently to analyze whether legacy store managers are performing

more non-exempt work than AIM store managers? A: No.")). Cumberland never tried to learn

the FLSA's requirements as they relate to LSMs. SOF ¶¶ 309, 321 (citing Bellrose Tr. 138:15-

19 ("Q: Did Cumberland Farms take any steps to learn the Fair Labor Standards Act

requirements as they relate to legacy store managers? A: No.")). Cumberland never analyzed

the FLSA's primary duty test for LSMs which is a key part of the exemption analysis. SOF ¶

309 (citing Bellrose Tr. 102:10-15 ("Q: Has Cumberland Farms ever assessed the primary duty

factor of the Fair Labor Standards Act as it relates to legacy store managers? A: No.")). Instead

of ensuring that LSMs were correctly classified and paid as an employer acting in good faith

would do, Cumberland instead chose to classify all LSMs as exempt and deny them overtime pay

for their many hard-earned overtime hours worked.

## II.    STANDARD OF REVIEW

Summary judgment must be granted if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). Once the moving party meets its initial burden of showing the Court that there are no genuine issues of material fact that should be decided at trial (as Plaintiffs have done here relying exclusively on Cumberland's own admissions and documents), the burden then shifts to the non-moving party to designate specific facts showing that a genuine issue of material fact exists for trial. *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660-61 (1st Cir. 2000). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec, Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## III.    ARGUMENT

### A.    Plaintiffs' Regular Workweek was Comprised of 50 Hours.

Under the FLSA, overtime compensation for hours worked over 40 in a workweek must be paid at time and one half the employee's' "regular rate" of pay. 29 U.S.C. § 207. "Regular rate" is defined to include, with certain enumerated exceptions, "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). "Calculation of the 'correct' regular rate is the linchpin of the FLSA overtime requirement." *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 10 (D. Mass. 2006) (internal citation omitted). A salaried employee's regular rate is determined by dividing the salary for each workweek by "the number of hours which the salary is intended to compensate." 29 C.F.R. § 778.113.

There is no genuine dispute that Cumberland paid its LSMs a weekly salary intended to cover 50 hours of work per workweek. Cumberland's Retail Store Manager Compensation and Incentive Plan sets forth that LSMs were expected to work 50 hours. The plans states: "Normally, a Retail Store Manager is expected to work fifty (50) hours per week because Cumberland Farms anticipates that the Store Manager's duties will require at least that

commitment. (However, there might be occasions when the Store Manager will have to work a greater number of hours in order to ensure that the store operates properly)."  Ex. 36 at CF_0017425.  Additionally, the Store Manager Job Description states that the expected hours are "50 regular hours/10 hour work day, depending on self directed schedule and Company needs." SOF ¶ 400 (citing Ex. 18 at CF_0028170).

Based on Cumberland's pay and policy documents, Cumberland cannot credibly contend that LSMs' salaries were intended to compensate them for all of the hours they worked.  Rather, the salary was designed to compensate LSMs for a regular 50 hour workweek.  Indeed, consistent with Cumberland's corporate documents, LSM's pay statements also list their regular hours as 50.  Ex. 34; *see also* Bellrose Tr. 132:12-14 ("Store managers are paid a salaried weekly amount that I believe approximates to 50 hours a week."); Sousa Tr. 32:9-12 ("███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████.").  Accordingly, Plaintiffs' regular rate should be calculated using a denominator of 50 hours.  *See* 29 C.F.R. § 778.113.

## B.    Cumberland Cannot, as a Matter of Law, Demonstrate that it Acted in Good Faith.

Cumberland has raised in its Answer to the Complaint an affirmative defense based on good faith. (Doc. 44, Ninth Affirmative Defense).  "The burden on defendants to demonstrate that they acted in good faith is a surprisingly heavy one, as caselaw construing 29 U.S.C. § 260 strongly suggests that liquidated damages must be awarded unless the employer can show that it solicited an opinion from the Department of Labor regarding the employment practice at issue, or relied on the advice of informed counsel." *Murphy v. Town of Natick*, 516 F. Supp. 2d 153, 161 (D. Mass. 2007) (citing *O'Brien v. Town of Agawam*, 482 F. Supp. 2d 115, 120 (D. Mass. 2007)); *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 142 (2d Cir. 1999) ("The employer bears the

burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception.").

Based on the evidentiary record, Cumberland cannot meet its burden to establish that it acted in good faith and had reasonable grounds for believing its classification of LSMs as exempt employees did not violate the FLSA. Cumberland did not make any effort whatsoever to demonstrate that its classification decision was reasonable or in good faith, much less seek a DOL opinion or advice of attorneys. *See O'Brien*, 482 F. Supp. 2d at 120 (finding that plaintiffs were entitled to recover liquidated damages where defendant made no attempt to demonstrate good faith in accordance with § 260). As noted, Cumberland flatly admitted, "We've never evaluated their day-to-day duties as it relates to their exemption status. To go back to my original answer, we have never evaluated legacy store managers for their exemption status, period." Bellrose Tr. 91:2-6; *accord* Bellrose Tr. 141:22-142:2 ("Q: Did Cumberland Farms ever request an opinion letter from anyone about the classification of legacy store managers? A: No.") & 141:2-8 ("Q: And are you aware of any analysis done by Cumberland Farms to confirm that store managers met the 2004 Department of Labor regulation? A: No."), 89:5-8 ("Q: Was any analysis of the legacy store manager position ever done regarding the way in which it's classified as exempt? A: No."), 71:1-6 ("Did Cumberland Farms take any steps to address the issue raised by Ms. Clark that legacy store managers spend more time in non-exempt duties than AIM store managers? A: No."), 88:8-12 ("Q: Did the company do anything independently to analyze whether legacy store managers are performing more non-exempt work than AIM store managers? A: No."), 138:15-19 ("Q: Did Cumberland Farms take any steps to learn the Fair Labor Standards Act requirements as they relate to legacy store managers? A: No."), 102:10-15 ("Q: Has Cumberland Farms ever assessed the primary duty factor of the Fair Labor Standards

Act as it relates to legacy store managers?  A:  No.").  Cumberland never took the required steps to show good faith, despite being an employer with ample resources to do so including $16.5 billion in revenue.[15]

Cumberland avers in its amended interrogatory responses that it made the classification decision "decades ago" and has no further information.

INTERROGATORY NO. 5:

Identify the person(s) who participated in making the decision to classify Store Managers as exempt from the overtime pay requirements of the FLSA and all documents containing or referring to any ruling, regulation or interpretation or decision of any kind issued, promulgated or drafted by the United States Department of Labor or any state department of labor upon which Defendants claim that they have relied upon in support of their decision to classify the Store Manager position as exempt, and all factors and data considered in making such decision.  This Interrogatory is not limited by time parameters.

ANSWER:

Cumberland Farms objects to this Interrogatory as overbroad and unduly burdensome to the extent it purports to seek information beyond what is relevant and proportionate to the needs of the case.  Cumberland Farms further objects to the Interrogatory to the extent that it seeks information subject to the attorney-client privilege or the work product doctrine.  Cumberland Farms further objects to this Interrogatory as overbroad to the extent it purports to seek information about all Store Managers, and is not properly limited to Store Managers of Cumberland Farm's Legacy format stores.

Subject to and without waiver of the foregoing general and specific objections, Cumberland Farms states that the decision to classify Store Managers as exempt from the overtime pay requirements of the FLSA was made decades ago.  After a diligent search, Cumberland Farms has not located any corporate records or employees with further responsive information.

INTERROGATORY NO: 6:

Describe whether Defendant sought the advice of counsel in making the decision to classify Store Managers as exempt from the overtime requirements of the

---

[15] Forbes website, https://www.forbes.com/companies/cumberland-gulf-group/ (last visited on December 14, 2017).

FLSA, and if so, identify the attorneys who provided such advice. This Interrogatory is not limited by time parameters.

ANSWER:

Cumberland Farms objects to this Interrogatory as overbroad and unduly burdensome to the extent it purports to seek information beyond what is relevant and proportionate to the needs of the case. Cumberland Farms further objects to the Interrogatory to the extent that it seeks information subject to the attorney-client privilege or the work product doctrine. Cumberland Farms further objects to this Interrogatory as overbroad to the extent it purports to seek information about all Store Managers, and is not properly limited to Store Managers of Cumberland Farm's Legacy format stores.

Subject to and without waiver of the foregoing general and specific objections, Cumberland Farms repeats and incorporates its response to Interrogatory No. 5, as if fully set forth herein.

Ex. 35.

In addition to the interrogatory admissions, other record evidence reveals that Cumberland ignored information from its own Human Resources Department suggesting that LSMs primarily perform non-exempt duties. In 2013, the Human Resources Department revised its retail job analyses. SOF ¶ 311. The revisions made indicated that the Store Manager and non-exempt, overtime eligible Assistant Store Manager positions shared an identical job analysis. *Id.* The primary duties listed for the Store Manager/Assistant Store Manager positions included many non-exempt duties "performed on a frequent basis" -- customer service, operating the cash register, bagging groceries, preparing coffee and keeping the coffee bar clean, changing bags of milk and cream in dispensers, and stocking food service equipment and keeping the food service area clean. *Id*. (citing Ex. 17 at CF_284). Further putting Cumberland on notice of issues with the FLSA exempt status of LSMs, in 2014, Dawn Clark, one of Cumberland's Human Resources Business Partners, flagged the issue for Cumberland that LSMs were performing more non-exempt duties than managers at Cumberland's new "AIM" format stores. SOF ¶ 321 (citing Ex. 19 at CF_108309). Ms. Clark cautioned the company that creating a new

job description for the LSM position would make it "**become more apparent how much more non-exempt duties that the legacy SM is performing to keep his/her store operating, so we will need to discuss this as a team before making this decision**." *Id.* (emphasis added).

Notwithstanding being on notice of FLSA misclassification issues, Cumberland took no steps to address the issue that LSMs spent more time performing non-exempt duties than AIM store managers. Bellrose Tr. 71:1-6 ("Q: Did Cumberland Farms take any steps to address the issue raised by Ms. Clark that legacy store managers spend more time in non-exempt duties than AIM store managers? A: No."). Cumberland never had any discussion about reclassifying LSMs to non-exempt status. Bellrose Tr. 70:1-74:4; 83:12-16 ("And nothing was done at Cumberland Farms to analyze what Ms. Clark said about legacy store managers performing more non-exempt duties than AIM store managers? A: No."); 85:15-21 ("Q: Did anyone at Cumberland Farms ask Ms. Clark for more details about her analysis as to why she wrote that it became more apparent that legacy stores were performing more non-exempt duties than AIM store managers? A: No.).

Indeed, Cumberland candidly admits that it did nothing whatsoever to analyze whether LSMs perform more non-exempt duties than AIM managers or to ensure that the LSM position was properly classified as exempt. Bellrose Tr. 89:5-8 ("Q: Was any analysis of the legacy store manager position ever done regarding the way in which it's classified as exempt? A: No."). Other than an "urban legend, because we have no facts or details" that an outside counsel may have done an analysis into the classification in the 1980s, Cumberland did nothing to ensure the proper classification of LSMs. Bellrose Tr. 93:14-95:17. "[T]here is no policy. It's just not – it's never been looked at. It hasn't been done. It hasn't changed. There's been no analysis …." Bellrose Tr. 96:9-19. Certainly, Cumberland cannot rely on an "urban legend" to demonstrate

good faith with respect to FLSA compliance. There is simply no factual basis in the record to support Cumberland's good faith defense. The Court should hold that Cumberland cannot meet its burden to establish a good faith defense and bar the defense from the case.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant partial summary judgment to Plaintiffs finding (1) that Plaintiffs' regular and expected workweek was comprised of 50 hours and that Plaintiffs' compensation was intended to compensate them for 50 hours each week and (2) that Cumberland cannot demonstrate a good faith defense set forth in its Tenth Affirmative Defense (D.E. 44) to avoid the imposition of liquidated damages, and awarding any other and further relief that the Court deems just and proper.

Dated:  December 15, 2017                          Respectfully submitted,

DIANNE BUCCERI, JANET CHARAK, and
LISA SANDERS, on behalf of themselves
and all others similarly situated,

By their attorneys,

_____
Michael J. Palitz, admitted *pro hac vice*
SHAVITZ LAW GROUP, P.A.
830 3rd Avenue, 5th Floor
New York, NY 10022
 (800) 616-4000
mpalitz@shavitzlaw.com

Hillary Schwab (BBO# 666029)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3261
hillary@fairworklaw.com

43

Sam J. Smith, admitted *pro hac vice*
Tamra Givens, admitted *pro hac vice*
BURR & SMITH, LLP
111 2nd Avenue N.E., Suite 1100
St. Petersburg, FL 33701
(813) 253-2010
ssmith@burrandsmithlaw.com
tgivens@burrandsmithlaw.com

Gregg Shavitz, admitted *pro hac vice*
SHAVITZ LAW GROUP, P.A.
1515 S. Federal Highway, Suite 404
Boca Raton, FL 33432
(561) 447-8888
gshavitz@shavitzlaw.com

## CERTIFICATE OF SERVICE

I, Michael Palitz, hereby certify that on December 15, 2017, this document was filed through the Court's ECF system and that Defendant's counsel includes registered users designated to receive Notices of Electronic Filings in this matter.

_____
Michael Palitz